# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SEATTLE HOUSING AUTHORITY, | ) | No. 75455-6-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE and SEATTLE | ) | |
| OFFICE FOR CIVIL RIGHTS, on behalf | ) | |
| of Ala Yudzenka, SEATTLE HUMAN | ) | |
| RIGHTS COMMISSION, and SEATTLE | ) | UNPUBLISHED OPINION |
| HEARING EXAMINER, | ) | |
| | ) | |
| Respondents. | ) | FILED: March 5, 2018 |
| | ) | |

MANN, J. — The city of Seattle's Open Housing Ordinance, chapter 14.08 of the Seattle Municipal Code (SMC), promotes the availability and accessibility of housing and real property to all persons. SMC 14.08.040D declares it an unfair housing practice to prohibit reasonable modifications and accommodations needed by a disabled tenant. The Seattle Housing Authority (SHA), an independent municipal corporation, performs two distinct roles relevant to this appeal. First, SHA owns and leases public housing to over 27,000 low income people. Second, SHA provides financial assistance to about 8,300 low income

households through rent vouchers in its role as administrator of the federal Housing Choice Voucher Program, commonly known as Section 8.

SHA appeals from a decision of the city of Seattle hearing examiner concluding that SHA violated SMC 14.08.040D by failing to make a reasonable accommodation for Ala Yudzenka, a Section 8 voucher recipient. Because under its plain language, SMC 14.08.040D only applies to landlords, and because SHA is not acting as a landlord when it administers the Section 8 voucher program, we reverse and vacate the hearing examiner's decision and order of August 19, 2015.

## FACTS

*SHA's Administration of the Section 8 Program*

The SHA administers the federally funded Section 8 voucher program. Through the Section 8 program, SHA provides vouchers for rent subsidy for rental units selected by the voucher participants. The rent subsidy is the difference between the market rent for the unit and 30 percent of the participant's income. The number of bedrooms that attach to a Section 8 voucher is based on the household size of the participant, so that a one-person household is generally eligible for a studio voucher. The voucher participant is not precluded from choosing to rent a larger apartment than designated under the Section 8 program, but the maximum rent subsidized by voucher is controlled by the participant's eligibility. If the participant chooses a larger apartment, they are responsible for any extra rent. In 2013, the maximum allowed amount SHA would pay for rent and utilities was $771 for a studio and $879 for a one-bedroom

No. 75455-6-I/3

unit.  As of December 2014, the maximum amount SHA paid for rent and utilities was $810 for a studio and $879 for a one bedroom unit.

### Underlying Facts

Ala Yudzenka has resided in a one-bedroom apartment in the Olive Ridge apartment complex since 2011.[1]  The Olive Ridge apartments are owned by SHA.  Prior to living at Olive Ridge, Yudzenka lived in a one-bedroom unit in another SHA building.  As a victim of domestic violence, Yudzenka suffers from posttraumatic stress disorder, anxiety, and depression.  She is unable to sleep in studio apartments because "she would become afraid if she heard footsteps or saw lights from the hallway under the studio apartment door."

In March 2013, while still leasing an apartment from SHA, Yudzenka was called from the waiting list and allowed to apply for a Section 8 voucher.  As a single-person household, Yudzenka qualified for a studio apartment.  Because of her disability, Yudzenka submitted a request for accommodation seeking a voucher for a one-bedroom apartment.  Yudzenka supported her request with a statement from her primary care physician.

In a letter dated April 23, 2013, SHA advised Yudzenka that the request "cannot be approved at this time" and that in accordance with SHA procedures was being referred to SHA's "ADA/504" Committee for review.  The committee reviewed Yudzenka's request and in June 2013, denied the request after

---

[1] The facts are taken primarily from the unchallenged findings of the Seattle Human Rights Commission and hearing examiner for the city of Seattle.  Unchallenged hearing examiner findings are verities on appeal. Getty Images v. City of Seattle, 163 Wn. App. 590, 599, 260 P.3d 926 (2011).

concluding that a "dark safe environment can be created in a studio unit."

Yudzenka requested and was granted an appeal hearing before the committee.

In July 2013, the appeal was denied, and on July 31, 2013, SHA issued a studio voucher to Yudzenka.

*Procedural History*

Yudzenka filed a complaint with the Seattle Office of Civil Rights (SOCR) on October 16, 2013. SOCR determined there was reasonable cause to believe that violations of the Fair Housing Amendments Act and SMC 14.08 were committed. SOCR referred the matter to the city attorney. In April 2015, the City and SOCR filed a complaint against SHA before the Seattle Human Rights Commission and hearing examiner for the city of Seattle (hearing examiner). Prior to the hearing, SHA moved to dismiss the complaint on the basis that as a Section 8 program administrator it was not a "landlord" within the meaning of SMC 14.08.040D. The hearing examiner denied the motion.

On August 19, 2015, the hearing examiner concluded that SHA violated SMC 14.08.040D "by failing to provide a reasonable accommodation" and ordered SHA to pay Yudzenka $1,500 and issue her a one-bedroom voucher.

SHA petitioned the superior court for a writ of review. The trial court affirmed the decision of the hearing examiner and denied SHA's writ of review. SHA appeals.

## ANALYSIS

### Standard of Review

The parties agree that the only issue before us on appeal is whether SMC 14.08.040D "applies to SHA as Section 8 voucher program administrator." When reviewing an appeal of a statutory writ, we review findings of fact for substantial evidence and conclusions of law de novo. Getty Images v. City of Seattle, 163 Wn. App. 590, 599, 260 P.3d 926 (2011). Because SHA did not assign error to any of the hearing examiner's findings, they are verities on appeal. We therefore determine whether the hearing examiner "erred in applying the law to the unchallenged facts." Getty, 163 Wn. App. at 599. The construction of a city ordinance is a question of law reviewed de novo. Sleasman v. City of Lacey, 159 Wn.2d 639, 642-43, 151 P.3d 990 (1997).

"The same rules of statutory construction apply to the interpretation of municipal ordinances as to the interpretation of state statutes." City of Seattle v. Green, 51 Wn.2d 871, 874, 322 P.2d 842 (1958). In interpreting a statute the "fundamental objective is to ascertain and carry out the Legislature's intent." Citizens All. v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015) (citation omitted). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Citizens All., 184 Wn.2d at 435 (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). When determining a statute's plain meaning we consider "the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided

for in the statute and related statutes." In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 839, 215 P.3d 166 (2009). We may look to a dictionary to determine the plain meaning of an undefined term. HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 451, 210 P.3d 297 (2009). We "construe a statute so that all the language used is given effect, with no portion rendered meaningless or superfluous." City of Seattle v. Swanson, 193 Wn. App. 795, 810, 373 P.3d 342 (2016) (internal quotations omitted). "Commonsense informs our analysis, as we avoid absurd results in statutory interpretation." State v. Alvarado, 164 Wn.2d 556, 562, 192 P.3d 345 (2008).

*Seattle Municipal Code 14.08.040D*

SHA contends that SMC 14.08.040D is expressly limited to landlords, and because it is not acting as a landlord in its role as administrator of the Section 8 voucher program, the code is not applicable. We agree for at least three reasons.

We start with the plain language of the ordinance. SMC 14.08.40D provides:

> It is an unfair practice to prohibit reasonable modifications needed by a disabled tenant. Whether or not the landlord permits tenants in general to make alterations or additions to a structure or fixtures, it is an unfair practice for a landlord to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy any dwelling, or to refuse to allow a person to make alterations or additions to existing premises occupied or to be occupied by a disabled person which are necessary to make the rental property accessible by disabled persons, under the following conditions:

1. The <u>landlord</u> is not required to pay for the alterations, additions, or restoration unless otherwise required by federal law;

2. The <u>landlord</u> has the right to demand assurances that all modifications will be performed pursuant to local permit requirements, in a professional manner, and in accordance with applicable building codes;

3. The <u>landlord</u> may, where it is reasonable to do so, condition permission for modification on the tenant's agreement to restore the interior of the premises to its pre-existing condition, reasonable wear and tear excepted.

SMC 14.08.040D (emphasis added).

While the term landlord is not defined within chapter 14.08 SMC, we look to the ordinary meaning, or, in this case, the dictionary definition. <u>HomeStreet,</u> <u>Inc.</u>, 166 Wn.2d at 451. Landlord is defined as "one who lets land to another: the owner or holder of land or houses which he leases or rents to another." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1269 (2002). This definition is premised on the relationship between the landlord and tenant as to the landlord's property; the landlord is the owner or manager of property that it lets to a tenant. SHA in its capacity as the Section 8 voucher program administrator is not acting as the owner of the property being leased to the tenant—it is instead assisting the tenant by subsidizing rental payment due to the landlord. SHA does not fit within the dictionary definition of a landlord.

Second, the statutory context of SMC 14.08.040D indicates a legislative intent to address unfair practices in the landlord-tenant relationship, not in the Section 8 voucher program. SMC 14.08.040D references three actors: "landlords," "tenants," and "disabled persons;" it does not reference Section 8

program administrators or other third parties providing a housing subsidy. The ordinance is further focused on "accommodations" to the physical property that "afford a disabled person equal opportunity to use and enjoy any dwelling." The ordinance illustrates such accommodation to include "alteration or additions" "necessary to make the rental property accessible." It then further conditions such accommodation by ensuring that: (1) the landlord is not required to pay for the alterations, additions, or restoration, (2) the landlord may require the modifications are professionally done consistent with the building code and permit requirements, and (3) the landlord can condition permission for modifications on the tenant's agreement to restore the property to its preexisting condition. SMC 14.08.040D(1)-(3). Again, as administrator of the Section 8 voucher program, SHA is not the controlling property owner with authority to make or approve modifications.

Finally, while SMC 14.08.040D appears limited to the landlord-tenant relationship, other provisions within chapter 14.08 directly address Section 8 voucher holders to protect them from discrimination in obtaining housing. For example, SMC 14.08.020 defines "Section 8 or other subsidy programs" as a "short or long term federal, state or local government, private nonprofit, or other assistance programs in which a tenant's rent is paid either partially by the program (through a direct arrangement between the program and the owner or lessor of the real property), and partially by the tenant or completely by the program." SMC 14.08.020 (emphasis added). Additionally, SMC 14.08.040(F) declared it an unfair practice to discriminate against Section 8 voucher holders in

determining tenant eligibility. SMC 14.08.040H declares it an unfair practice to fail to cooperate with a Section 8 voucher holder in completing required information for the voucher program or fail to accept a pledge from the Section 8 program to pay past due or current housing costs. These provisions demonstrate that the city council knew how to discuss Section 8 voucher holders and protect them from discrimination, and yet did not include the Section 8 program administration within SMC 14.08.040D.

The City raises a series of arguments urging us to extend the plain language of SMC 14.08.040D to include SHA in its capacity as the Section 8 voucher program administrator. We address each in turn.

First, the City urges us not to rely too heavily on the word "landlord" in SMC 14.08.040D. But a plain-meaning analysis requires that we look to the "the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes." Chevelle, 166 Wn.2d at 839. Here, as discussed above, the plain meaning of SMC 14.08.040D limits its applicability to landlords, and not SHA in its role as the Section 8 voucher program administrator.

Second, the City argues that the SHA's interpretation ignores the broader regulatory and statutory context. It argues that the first sentence of SMC 14.08.040D—"It is an unfair practice to prohibit reasonable modifications needed by a disabled tenant"—applies universally. The City reads this first sentence to mean that it is an unfair practice for anyone to prohibit reasonable modifications needed by a disabled tenant. Relatedly, the City argues that the words "any

-9-

dwelling" in SMC 14.08.040D do not mean any particular, specific, or existing dwelling. These arguments fail because they are not in harmony with the plain meaning of SMC 14.08.040D. The first sentence makes it an unfair practice to "prohibit reasonable modifications needed by a disabled tenant" without specifying who may not prohibit reasonable modifications. But this mandate can only be directed at landlords. To read the first sentence as applying to everyone makes the second sentence's first clause—"Whether or not the landlord permits tenants in general to make alterations or additions to a structure or fixtures"— meaningless because the second sentence refers to a narrower category of people than the first. Moreover, the word "tenant" in the first sentence and the references to landlords in the section's second, third, fourth, and fifth sentences creates an inference that the section only applies to the landlord-tenant context. And finally "modification" is different from "accommodation;" it means "the act or action of changing something without fundamentally altering it." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1452 (2002). This word further limits the sentence's mandate to a real-property context.

Third, the City argues that the plain meaning of the word "landlord" is contrary to one of chapter 14.08's purposes: "to promote the availability and accessibility of housing and real property to all persons." SMC 14.08.010(A). Although the chapter's broad purpose contemplates protection from a Section 8 program administrator unreasonably denying an accommodation request, section .040D is written too narrowly to accomplish this purpose. Section .040D is silent on the Section 8 program or housing-subsidy programs, despite the fact that

section .020 defines these programs and subsection .040(F)(1) references these programs. See SMC 14.08.020 (defining "Section 8 or other subsidy program"); SMC 14.08.040(F)(1) (making it an unfair practice for a landlord to use participation in the Section 8 program in screening applicants' eligibility).

Fourth, the City argues that a plain-meaning interpretation of landlord defies the mandate in chapter 14.08 that "the provisions of this chapter shall be liberally construed to accomplish [the chapter's] purposes." SMC 14.08.010(A). "A policy requiring liberal construction is a command that the coverage of an act's provisions be liberally construed and that its exceptions be narrowly confined." Nucleonics All. v. Wash. Pub. Power Supply Sys., 101 Wn.2d 24, 29, 677 P.2d 108 (1984). Construing "landlord" liberally to include administrators of the Section 8 program would override SMC 14.08.020's existing definition of "Section 8 or other subsidy program" by conflating two separate things included in the definition—a landlord and a Section 8 Program administrator—into one. See SMC 14.08.020 ("Section 8 or other subsidy program' means short or long term federal, state or local government . . . in which a tenant's rent is paid either partially by the program (through a direct arrangement between the program and the owner or lessor of the real property), and partially by the tenant or completely by the program.").

Fifth, the City argues that because Section 8 voucher holders are protected in parts of chapter 14.08, it follows that the city council intended the protections provided in SMC 14.08.040D to extend to Section 8 voucher holders in their interactions with Section 8 program administrators. We disagree. "[I]f the

statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Citizens All., 184 Wn.2d at 435 (citation omitted). The language of SMC 14.08.040D is clear: it does not address Section 8 voucher holders or administrators of Section 8 housing programs.

Sixth, the City argues that limiting application of SMC 14.08.040D to landlords leads to an absurd result: disabled voucher holders who are denied their request for a voucher for a larger rental unit have no recourse, a result that contravenes the section's spirit and purpose. Again, we disagree. "It is true that we should not so interpret a statute as to reach an absurd result, but neither should we make an absurd interpretation to reach a desired result." Cooper's Mobile Homes, Inc. v. Simmons, 94 Wn.2d 321, 326, 617 P.2d 415 (1980) (internal citation omitted). Shoehorning a Section 8 administrator into the term "landlord" is "an absurd interpretation to reach a desired result." Simmons, 94 Wn.2d at 326.

Finally, the City urges us to consider the legislative history and similar federal legislation, but because the ordinance's plain language is not ambiguous, we decline to do so. We hold that the plain meaning of SMC 14.08.040D shows that the city council only intended the section to apply to discrimination between landlords and tenants in the city, not discrimination between Section 8 voucher holders and administrators.

The City is not, however, without recourse. As both the City and SHA agreed during oral argument, if the City wishes to extend the unfair practice requirement of SMC 14.08.040D to include a requirement that Section 8 program

administrators like SHA make reasonable accommodations including granting vouchers for larger rental units than the current guidelines require, then it can amend the Seattle Municipal Code accordingly. The Seattle City Council, not this court, is in the best position to effectuate this change. "It is our duty to effectuate the legislature's intent, not rewrite the words the legislature used." State v. Gray, 189 Wn.2d 334, 343, 402 P.3d 254 (2017).

Because SMC 14.08.040D only applies to landlords, and since SHA as administrator of the Section 8 program is not a landlord when it acts in its capacity as a Section 8 program administrator, we reverse and vacate the hearing examiner's decision and order of August 19, 2015.

Mann, J.

WE CONCUR:

Appelwick, J.

Becker, J.